FILED

2005 Jun-13  AM 10:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **SCOTTSDALE INSURANCE COMPANY** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **vs.** ] | **CIVIL ACTION NO. 04-VEH-2901-NE** |
| ] | |
| **CURTIS BALDWIN, et al.,** ] | |
| ] | |
| **Defendants.** ] | |

### Memorandum of Opinion

## I.    INTRODUCTION

This is a civil action, filed on October 1, 2004, by the Plaintiff, Scottsdale Insurance Company ("Scottsdale"), against the Defendants Curtis Baldwin and Christina M. Baldwin-Cannon.   The action is filed pursuant to the Federal Declaratory Judgment Act, and Rule 57 of the Federal Rules of Civil Procedure.  It seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

Presently before the Court is the Motion for Summary Judgment of the Plaintiff (doc. 13).  For the reasons stated herein, the Plaintiff's Motion for Summary Judgment will be **DENIED**.  Summary Judgment will instead be **GRANTED** in favor of the Defendants as to the issues in Plaintiff's motion.

## II.    FACTS[1]

Scottsdale filed the Complaint for Declaratory Judgment in the instant case, asking that this Court declare its rights, remedies, obligations, and liabilities with respect to a Commercial General Liability Policy issued to Nanny's Old Fashion Lemonade ("Nanny's") under which Curtis Baldwin ("Baldwin") has requested defense and indemnity for a lawsuit styled *Christina M. Baldwin-Cannon, Administratrix of the Estate of Bayron Leon Cannon, deceased v. Curtis Baldwin, an individual doing business as Nanny's Old Fashion Lemonade*, CV-04-1960JPS, pending in the Circuit Court of Madison County, Alabama.  (Hereinafter referred to as the "*Cannon* Suit").

_____The *Cannon* Suit alleges that on or about May 21, 2003, Bayron Leon Cannon ("Cannon") was electrocuted after plugging an extension cord from a garage building into a truck.  Count One of the *Cannon* Suit, entitled "Negligence", alleges that Baldwin negligently wired the building and negligently failed to protect the building outlet with a ground fault circuit interrupter, thereby proximately causing the death of Cannon.  Count Two of the *Cannon* Suit, entitled "Premises Liability", alleges that Baldwin failed to maintain the premises where the accident occurred in a reasonably safe condition, thereby proximately causing the death of Cannon.

---

[1]The facts herein are recounted and considered, as the Court must, in the light most favorable to the non-movant.  To the extent necessary, the Court will note where the parties disagree on the facts.

Baldwin has demanded coverage under his Scottsdale insurance policy for the claims made in the *Cannon* Suit.  Scottsdale is presently defending Baldwin under a strict reservation of rights.

Baldwin's Scottsdale Policy contains the following pertinent language:

### *COMMERCIAL GENERAL LIABILITY COVERAGE FORM*

### *SECTION I - COVERAGES*

### *COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY*

*1.    INSURING AGREEMENT*

> *a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply...*
>
> * * *
>
> *b.    This insurance applies to "bodily injury" and "property damage" only if:*
>
>> *1.    The "bodily injury" and "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and*
>>
>> *2.    The "bodily injury" and "property damage" occurs during the policy period;...*

(Exhibit 2, p. 1).

*2.    EXCLUSIONS*

> *This insurance does not apply to:*
>
> * * *
>
> *g.    Aircraft, Auto, or Watercraft*

*"Bodily injury" or "property damage" arising out of the ownership, maintenance,  use or entrustment to others of any aircraft, "auto", or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."*

*This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.*

*This exclusion does not apply to:*

*(1) A watercraft while ashore on premises you own or rent;*

*(2) A watercraft you do not own that is;*

> *(a)    Less than 26 feet long; and*
> *(b)    Not being used to carry persons or property for a charge;*

*(3) Parking an "auto" on, or on the ways next to premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;*

*(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or*

*(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of mobile equipment.*

\* \* \*

## SECTION V - DEFINITIONS

\* \* \*

**2.**      *"Auto" means a land motor vehicle, trailer, or semi-trailer designed for travel*

4

*on public roads, including any attached machinery or equipment.  But "auto" does not include "mobile equipment."*

**3.**     *"Bodily injury" means bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time.*

\* \* \*

**12.**    *"Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:*

\* \* \*

**f.**     *Vehicles not described in **a., b., c.,** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.  However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":*

\* \* \*

**(2)** *cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and*

**(3)** *air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.*

\* \* \*

**13.**    *"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.*

\* \* \*

Nanny's is a sole proprietorship, owned by Baldwin and his wife, Patricia Baldwin, that sells fresh squeezed lemonade at various public events and outdoor functions.  The Baldwins travel to these various events, set up their lemonade stands, and sell lemonade.  The Baldwins' friends and family work the stands at the various events.

Cannon was Baldwin's son-in-law, married to his daughter, Christina Baldwin-Cannon.   Cannon often sold lemonade for Nanny's at the various events they

attended.  Christina Baldwin-Cannon filed the *Cannon* Suit against her father Baldwin, on behalf of the estate of Cannon.

Baldwin owns a twenty-four (24) foot box truck, which he has significantly modified, that he uses in Nanny's business.  This box truck is the vehicle that was involved in the incident made the basis of the *Cannon* Suit.  A photograph of Baldwin's box truck is attached hereto as "Exhibit 4".  When Baldwin purchased the box truck, it consisted of a cab and the box.  Baldwin then significantly modified the truck making it into what he calls, a "mini motor home."  Baldwin installed a doorway between the cab and the box, insulated the interior walls, installed a shower, installed a commode, and installed a three compartment sink.  He also installed a dinette that converts into a bed, put in a couch, replaced the back roll-up door with a wall, installed a door on the passenger side of the box, installed an air conditioner on the roof of the box, and installed a built-in booth were someone can sit down and eat.

Baldwin installed 110 volt outlets throughout the truck.  These 110 volt outlets are used to provide power to the microwave, television, refrigerator, calculator, and phone chargers, all located in the box truck.  The 110 volt outlets are wired to a breaker box in the truck.  Power is supplied to the breaker box, and in turn to the 110 volt outlets, by either an outside power source or a gasoline generator installed in the

truck.

Usually, the generator provides power to the 110 volt outlets while the truck is en route to an events.  Once they arrive at the event, the generator is not used; instead, the truck is connected to an outside power source provided by the event organizer.

There is an electrical cord with a male plug running from the breaker box which connects it to either the outside power source or the generator.  To connect it to an outside source, one runs an extension cord from that source and plugs the female end of the extension cord into the male end of the breaker box cord.  There is a separate cord that runs from the generator with a female end on it.  To connect the breaker box to the generator, one plugs the female end of the generator cord into the male end of the breaker box cord.  There is a small door near the rear of the truck, on the driver's side, which provides access to the breaker box cord and the generator cord.

The  refrigerator in the truck is used to keep drinks, food, and sandwiches cold for workers while they are taking a break from selling lemonade.  By keeping cold drinks and food in the refrigerator, workers can take a quick break, get something to eat and drink, and then return to their stand.  This enables workers to avoid the long lines for food and drink at the various events.

Typically, on the night before they leave for an event, Baldwin parks the truck at his home and connects it to an outside power source so that the refrigerator will cool off and allow them to stock it with the drinks and food that they will be taking to the event.  Before ninety-five percent of all events, Baldwin takes the truck to his house in order to plug it into an external power supply so that he can cool the refrigerator before they put the food in it.

The only reason Baldwin bought this truck was to use it in the business of selling lemonade.  He did not buy it for any other reason.  The truck is essentially used as an office, lounge, kitchen, and restroom for the Baldwins and their workers at the events.

On the afternoon of the incident, Cannon stopped by the Nanny's shop on Evangle Circle, at which supplies, equipment, stands, and the box truck were regularly kept.  At the shop, Cannon and Baldwin discussed the upcoming Montgomery Jubilee, at which they would be selling lemonade the next day.  Then the two men went to Baldwin's Laverne Drive home.  Baldwin drove the box truck to his house and backed it into his driveway.  The Baldwin family, including Cannon, had planned on going out to dinner that evening.

As Baldwin was getting in his Suburban to go pick up his daughter, he realized that he had not plugged the box truck to an external power source so that the

refrigerator could get cold and allow them to put food and drinks in it for the event they were going to.  Cannon followed Baldwin to the shop to help plug in the box truck.  Baldwin raised the door to the shop and picked up the male end of an extension cord to plug into an outlet in the shop.  Cannon picked up the female end of the same extension cord and began walking towards the box truck.

As Baldwin prepared to plug his end of the extension cord into the shop outlet, he noticed that Cannon was squatted down, facing the small door on the truck that provided access to the breaker box cord.  Baldwin assumed that Cannon had plugged the female end of the extension cord into the box truck.  Baldwin plugged the male end of the extension cord into the shop outlet.  As soon as he did, he realized that something was wrong with Cannon.  Baldwin immediately unplugged the extension cord from the shop and went to help Cannon.

As Baldwin approached Cannon, he could tell that something was wrong. Baldwin called 911.  Cannon was later pronounced dead at the scene by the paramedics.

Baldwin did not notice whether the female  end of the extension cord was plugged into the truck when he approached Cannon.   However, Investigator James Williams, a crime scene investigator with the Huntsville Police Department, testified that when he arrived at the scene, the female end of the extension cord was plugged

into the truck.

Prior to the police and paramedics arriving, Baldwin unplugged the extension cord from the shop building.  He did not otherwise move anything or disturb the scene of the incident.

Baldwin testified that the box truck's generator was not involved in the incident.  Neither Baldwin nor Cannon connected anything to the truck's generator before the accident.  The generator was not running at the time of the incident.

## III.   STANDARD OF REVIEW

> In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir. 2004).

## IV.   Analysis

The Plaintiff argues that exclusion "g" cited above applies in this case because the *Cannon* case concerns "'Bodily injury' or 'property damage' arising out of the .

10

. . maintenance, [or] use [of an] 'auto'."

> **A.    Connecting the Truck to an External Power Source In Order to Power the Truck's Refrigerator Does Not Constitute "Maintenance" of the Truck.**

In support of its argument, Scottsdale's two primary citations are to *Broadway v. Great American Ins. Co., Inc.*, 465 So.2d 1375, 1377 (Ala. 1992), and *Alabama Farm Bur. Mut. Cas. Ins. Co. v. Tubbs*, 304 So. 2d 589 (1974). *Broadway* involved an attempt to start a vehicle by pouring gasoline into a carburetor to prime the engine. The Alabama Supreme Court held that "[t]he term 'maintenance' has been defined as the labor of keeping something in a state of repair or efficiency." *Broadway*, 465 So. 2d at 1127. It then held that such an action was maintenance of the automobile. *Broadway* involved a homeowners policy which excluded coverage for maintenance of an automobile.

By contrast, the policy in *Tubbs* was an automobile liability policy which provided *coverage* if the injury arose out of maintenance. In *Tubbs*, the insured welded a bracket onto his vehicle in order to strengthen a trailer hitch that was already attached to the vehicle. *Tubbs*, 304 So. 2d at 590. The insured, in attempting to establish coverage, argued that the welding was maintenance. The Alabama Supreme Court agreed.

As an initial matter, the *Tubbs* case is distinguishable simply because of its

posture.  The policy at issue in *Tubbs* is a different type of policy than the one at issue in this case.  In addition, here the court is faced with an *exclusion*, whereas in *Tubbs* the issue was whether the act fell within a provision *providing* coverage.  Alabama law provides that insurance contracts are to be strictly construed against the insurer and liberally construed in favor of the insured.  *Cotton States Mutual Insurance Co. v. Michalic*, 443 So. 2d 927 (Ala. 1983).  Exclusionary clauses must be construed in the most narrow manner possible so that the insured is provided maximum coverage. *Id.*

Both cases are distinguishable also because the facts of both involve some act done to start the auto (*Broadway*) or improve the auto (*Tubbs*).  In both instances, the conduct was done to cause the auto to run, or run more efficiently, as an auto.  In the instant case, the act which caused the injury, hooking the truck up to AC power, had nothing to do with how the auto ran.  Connecting the truck to the AC power supply did not effect whether the truck would run and operate properly as a truck.  It cannot fairly be said that providing AC power to the truck was keeping *the truck* in a state of repair or efficiency.  It is undisputed that connecting the power was done solely to cause the *refrigerator* inside the truck to cool down.   The exclusion for "maintenance" therefore does not apply.

      **B.**    **Connecting the Truck to an External Power Source In Order to Power the Truck's Refrigerator Does Not Constitute "Use" of the**

Truck.

Likewise, the cases cited by the Plaintiff do not support the contention that the injury which occurred in this case arose out of a "use" of the truck.  The *St. Paul* decision deals with an exclusion in an auto policy for accidents "due to" the use of an auto.  The instant case involves an exclusion in a CGL policy which involves accidents "arising out of" the use of an auto.  Also, *St. Paul* involves an infant who was transported in a vehicle, then left there, unattended, and died.  The Court in *St. Paul* noted "the fact remains that Randy died in the van while it was being used by the Center to provide transportation services to the communities it serves."  *St. Paul*, 595 So. 2d 1375, 1377 (Ala. 1992).

In *Taliaferro*, the second case cited by the Defendant, the Alabama Supreme Court clearly held that an accident does not arise out of the "use" of a vehicle, if the vehicle is the "mere situs" of the accident.

The injury did not arise out of use of the truck as a truck.  Indeed, no one was in the truck when the accident occurred.  The court is convinced that, in this case, the truck was the mere situs of the injury.

## V.    CONCLUSION

The two exclusions for "maintenance" and "use", which the Plaintiff urges the Court to find applicable, are clearly not applicable as a matter of law.  Accordingly,

the Motion for Summary Judgment will be **DENIED**.  Because there is no genuine

issue of material fact, and the Defendant is entitled to Judgment as a Matter of Law,

the Court sees no justification in delaying Judgment in favor of the Defendant on

these issues.  Summary Judgment will accordingly be **GRANTED** in favor of the

Defendant and against the Plaintiff on these issues.

      **DONE** and **ORDERED**, this 13th day of June, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge